IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LIONEL SHELL,

    Petitioner,

v.

GREG LEWIS, Warden,

    Respondent.

_____/

No. C 11-2515 JSW

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

## INTRODUCTION

Now before the Court is Lionel Shell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 related to his 2008 convictions. After considering the administrative record, the parties' papers and arguments, and reviewing the relevant legal authority, the Court hereby DENIES the petition.

## FACTUAL BACKGROUND

The facts underlying the charged offense as found by the Court of Appeal of the State of California, First District, are summarized below as follows:

> In a drive-by gangland shooting, defendant Lionel Shell killed an innocent bystander and wounded a rival gang member. Defendant confessed the shooting to the police, and two accomplices identified defendant as the shooter. At trial, defendant recanted his confession, denied all participation in the shooting, and implicated another gang member. A jury rejected the defense and convicted defendant of first degree murder, attempted murder, and shooting from a motor vehicle. (Pen. Code, [sic] §§ 187, subd. (a), 664, 12034, subd. (c).) The court sentenced defendant to life in prison without parole. Defendant appeals the judgment.
>
> ...

Acorn and Lower Bottoms are rival street gangs in West Oakland engaged in a turf war. On the afternoon of January 31, 2006, Lower Bottoms member Anthony "Ant" Henderson was shot in the back by a member of the Acorn gang near McClymonds High School. Lower Bottoms retaliated later that day with the shooting at issue here.

*A. The shooting*
Jonathan "Red Bone" Gonzalez is an Acorn member. On the night of January 31, 2006, Gonzalez was standing in front of a store speaking with Gamel Attayeb, a friend of the store owner and unaffiliated with any gang. Gonzalez noticed a car moving slowly toward him and saw a rifle pointed out the rear passenger window on the driver's side. Gonzalez ran and told Attayeb to do the same. Gonzalez heard seven to ten shots fired in rapid succession. A bullet struck Gonzalez in the arm. The bullet shattered a bone in his forearm, leaving him with pain and limited mobility in his hand two years later. Attayeb died within minutes from a single bullet entering his torso that ripped through major organs and arteries. The fatal injury was consistent with a high-powered rifle shot. The police recovered seven shell casings at the scene of the shooting: all Winchester 7.62 caliber cartridges fired by a single AK-47 type rifle.

*B. The surviving victim's testimony and police statement*
At trial, Gonzalez said he saw the shooter for only "half a second" and was unable to identify him. Gonzalez was a reluctant witness who said he worried for his safety if he "snitch[ed]." Gonzalez did admit giving the police a limited description of the events two weeks after the shooting. In his conversation with the police, which was surreptitiously recorded, Gonzalez described the shooter as an African-American male with "dreads," a type of hairstyle. Gonzalez said the shooter "looked like [Matthew T.]" but the rumor on the street was that it was Anthony Harris, and Matthew T. and Harris look alike. The police asked Gonzalez, "[s]o you think [Matthew] shot you," and Gonzalez replied "[h]e shootin' all my niggas." The police tried to determine what Gonzalez actually saw, not his suppositions. Gonzalez told the police "I'm not saying [Matthew] shot me," but "[i]t looked like [Matthew] or Anthony" and people "say Anthony did the shooting." Gonzalez also told the police the vehicle was a "gray, or a grayish blue bucket...like the little-little Chevy Nova" from the 1980s. Gonzalez said the rifle looked like an SKS or AK-47 type of rifle, although he was unsure of the difference. At trial, Gonzalez said he named Matthew T. and Anthony Harris based on things he heard on the street, not his observation of the shooter.

*C. The police investigate leads from an informant*
On the same day that the police interviewed Gonzalez, they pursued their investigation of possible suspects in the shooting by conducting a parole search of Lavon Mitchell, a Lower Bottoms gang member. A significant part of the information that led to the search came from a police informant. At trial, the police referred to the informant as "[a] confidential reliable informant," which was described as someone who works with the police and who has provided information in the past that proved accurate. This informant began providing the police with information about the shooting the day after it occurred. The information included the names of suspects and the location of the murder weapon. The informant never named defendant as a suspect.

Based on the informant's report, the police searched parolee Mitchell for the murder weapon. Parole searches are limited in scope to the parolee's room, person, and belongings. No firearm was found during the parole search. On the same day as the search, and shortly after it was concluded, the police informant reportedly saw C.T. (Matthew T.'s brother) walking down the street "with a long cylindrical object stuffed down his pant leg" before entering C.T.'s house. Based on this observation of a possible "transfer of the rifle" from Mitchell's house to C.T.'s house, the police obtained a warrant and searched the latter's house the following day for firearms. The police looked for the murder weapon but it was not found. However, other firearms were

2

found in the house, and people were arrested. Those arrested were Matthew T., Maurice J., and Tommy "Twin" Miller, all Lower Bottoms gang members. The firearms seized were three handguns and a shotgun. The police also seized an empty, detachable ammunition magazine for an assault rifle. One of the officers who conducted the search testified that the magazine was for 7.62 caliber ammunition. A police evidence technician testified that 7.62 caliber is a common size of ammunition and that, in her experience, every rifle shooting she has seen used either 7.62 or .223 rounds.

*D. Maurice implicates himself and others*

The police interviewed Matthew T. and Maurice J., and it is the interview of Maurice that led the police to defendant and two other men charged with the shooting. Four individuals were charged with participation in the shooting: Maurice, Tonney Killingsworth, Mario "Rio" Hairston, and defendant Lionel Shell. In an initial interview, Maurice implicated another individual named Lionel-Lionel Green-instead of defendant Lionel Shell. Maurice later identified defendant Shell as the shooter, and said he misdirected the police earlier because he "didn't want to give [his] friend up." The police arrested defendant and, later, Killingsworth and Hairston.

*E. Defendant's confession*

Defendant identified himself as a Lower Bottoms gang member when arrested and booked in jail. Defendant is an African-American with dreadlocks, which matches the limited description provided by victim Gonzalez. Sergeant Tony Jones interviewed defendant, and obtained a confession. Defendant's denials lasted for an hour and forty minutes, during which Sergeant Jones played a portion of Maurice's statement to defendant and urged him to tell the truth. This early segment of the interview was memorialized in police notes but not tape recorded. Sergeant Jones testified that, at one point during this early stage of the interview, defendant "put his head down on the table, he got back up and he said 'This is fucked up. Them dudes ain't cool." A break was taken when defendant said he was hungry.

After defendant ate a meal, the police reentered the room and defendant said " 'Okay, I was playing earlier,' " and started describing the shooting. Defendant said Maurice, Killingsworth, and Hairston were in the car with a rifle when they picked him up and told him they were "going to do a hit on the Acorn" gang. Defendant said they pointed out the target, told him to shoot, and "he felt like he had to or they were gonna do something to him" so he "opened fire." In the interview, defendant indicated the location of the car and victim on a diagram and described the car occupants' seating arrangement. Defendant said Killingsworth was driving, Hairston was in the front passenger seat, Maurice was in the rear seat behind the passenger, and defendant himself was in the rear seat behind the driver. Defendant thus admitted sitting in the seat from where the victim Gonzalez reported shots fired. Defendant identified Maurice, Killingsworth, and Hairston from a line-up of six photographs for each man.

After this early stage of the interview, Sergeant Jones tape recorded a confession from defendant and that confession was played for the jury. [The Court] reviewed a written transcript that shows the statement to be consistent with defendant's earlier admissions to the police. Defendant said he was at the corner of 15th and Center Streets when Maurice, Killingsworth, and Hairston picked him up in a "a gray little bucket" and told him they were "fixing to do a hit." A rifle was already in the car. Defendant admitted firing the rifle "[a]bout like six times" from his seat behind the driver, Killingsworth. Defendant said the target was Gonzalez, and the shooting was in retaliation for an Acorn school shooting of Maurice's friend, Anthony, earlier that day. Defendant was able to describe the clothes worn by his accomplices and the precise driving route taken to the scene of the shooting. Defendant said he felt pressured by the others to do the shooting, that his target was Gonzalez and that Attayeb's death was an "accident." Defendant said he left the rifle in the car after the shooting and went to a friend's house.

3

About four hours after making this confession to Sergeant Jones, defendant repeated it to a deputy district attorney and district attorney inspector. An audiotape of the statement was played for the jury, and [the Court has] reviewed a written transcript. The statement is consistent with his police confession.

*F. Participants in the shooting identify defendant as the shooter*

Killingsworth and Hairston were arrested and they each told the police that defendant was the shooter. At trial, Killingsworth and Hairston admitted their participation in the shooting and identified defendant Shell as the shooter. Killingsworth testified that he and Hairston were together playing a video game when he received a telephone call from Maurice J. saying "they're out there" and asking for a ride "to Acorn" to "get on somebody." Killingsworth understood that Maurice wanted to shoot an Acorn gang member to retaliate for Ant's shooting. Ant is a friend of Maurice and defendant. Killingsworth, with Hairston as passenger, drove Killingsworth's old, gray Chevy Nova to 15th and Center Streets, where they picked up Maurice and defendant. Maurice sat behind Hairston, and defendant was behind Killingsworth, the driver.

The four men drove through the Acorn area, saw Gonzalez, and then drove to defendant's home where he picked up a MAK-90 rifle. The men returned to the store where Gonzalez was seen. Killingsworth drove slowly past the store and defendant started shooting out the rear window. Killingsworth thought defendant fired "[p]robably like four or five shots." The men saw someone fall, Maurice said "[h]e hit, he hit,"and Killingsworth pulled the car away. Killingsworth dropped off defendant and Maurice near defendant's home. Killingsworth said defendant took the rifle with him.

Killingsworth agreed to testify in exchange for a negotiated disposition in which he pleaded guilty to involuntary manslaughter with a 24-year prison sentence. Hairston also agreed to testify in exchange for a negotiated disposition. Hairston pleaded guilty to manslaughter with a 13-year sentence.

Hairston's testimony agreed with Killingsworth's in all material respects. Hairston testified that he was with Killingsworth when Killingsworth received a telephone call from Maurice asking for a ride. Killingsworth and Hairston drove Killingsworth's "little gray car," a "Chevrolet or something," to 15th and Center Streets where they picked up Maurice and defendant. The four men went to defendant's house where he picked up a MAK-90 rifle. The men drove to Acorn to retaliate for Ant's shooting earlier in the day. Defendant was in the rear seat behind the driver, Killingsworth. Defendant fired "four or five" shots at Gonzalez who was standing in front of a store talking with someone. Hairston heard Maurice say "he hit, he hit," and the men drove away.

*G. The Defense*

Defendant testified at trial and recanted his confession. Defendant denied all participation in the shooting, and said he confessed because he was "scared" and under pressure by Sergeant Jones who offered to talk to the district attorney about charging defendant with manslaughter, and not murder. Defendant did not offer an alibi at trial. On cross-examination, the prosecutor asked defendant where he was on the day of the shooting, and defendant said: "I don't remember." Defendant admitted that, about five months before the fatal shooting, he was arrested carrying a loaded handgun following the shooting of another Lower Bottoms gang member. At that time, he was arrested in the company of gang member Michael J., Maurice J.'s brother. Defendant also admitted being a crack cocaine dealer.

The defense offered two character witnesses: defendant's high school coach in football and track, and a high school teacher. The coach said defendant was not a violent person during the time he knew him, through June 2004 when defendant left school. The teacher also opined that defendant is not violent and described him as "a gentle person."

4

> In defense counsel's closing argument to the jury, counsel emphasized victim Gonzalez's statement to the police that the shooter looked like Matthew T. and argued that a reasonable doubt existed as to whether Matthew-and not defendant-was the actual shooter. Counsel noted that a police informant led the police to the house of Matthew, not defendant. Counsel argued: "there is a reasonable possibility that it was [Matthew] that did this shooting."
>
> *H. Jury verdict and sentencing*
> The trial lasted a month, and the jurors deliberated for six days. The jury found defendant guilty of first degree murder of Attayeb perpetrated by means of a firearm discharged from a motor vehicle and committed by an active participant in a criminal street gang to further the activities of the gang. (Pen. Code, [sic] §§ 187, 189, subd. (a), 190.2, subd. (a)(21), (22).) The jury also found defendant guilty of attempted murder of Gonzalez and shooting from a motor vehicle. (Pen. Code, [sic] §§ 187, subd. (a), 664, 12034, subd. (c).) Several enhancements were found true: the crimes were committed to benefit a street gang, and personal and intentional discharge of a firearm caused death to Attayeb and great bodily injury to Gonzalez. (Pen. Code, [sic] §§ 186.22, subd. (b)(1), 12022.5, subd. (a), 12022.53, subds. (b), (c), (d) & (e)(1), 12022.7, subd. (a).)
>
> The court sentenced defendant to life without parole for Attayeb's murder. (Pen. Code, [sic] §§ 187, 190.2, subds.(a)(21), (22).) Defendant was sentenced to an additional term of 42 years to life for the attempted murder of Gonzalez: the 7-year midterm for the principal offense, plus 25 years to life for discharging a firearm causing great bodily injury, plus 10 years for committing the crime for a street gang. (Pen. Code, [sic] §§ 186.22, subd. (b)(1)(C), 187, subd. (a), 664, subd. (a), 12022.53, subd. (d).) Sentence for the shooting from a motor vehicle offense was stayed. (Pen. Code, [sic] § 654 .)

(Answer Exhibit ("Exh.") 4, at 1-9.)

## PROCEDURAL BACKGROUND

In 2008, a state court jury convicted Shell of first degree murder, attempted murder, and shooting from a motor vehicle. The Appellate Court affirmed the conviction. The Appellate Court denied a petition for rehearing. In 2010, the California Supreme Court denied a petition for review. Shell now files a petition for a writ of habeas corpus.

## JURISDICTION AND VENUE

Shell claims violations of the Constitution of the United States and has exhausted all remedies available to him in state court. Accordingly, this Court has subject matter jurisdiction. 28 U.S.C. § 2254. Shell filed his petition within one year and 90 days of the finality of his state court proceedings. 28 U.S.C. § 2244(d)1A. The petition was timely as Shell had an appeal to the California Supreme Court pending until February 25, 2010 and Shell filed the petition on May 24, 2011. 29 U.S.C. § 2244(d)1A. The challenged conviction occurred in Alameda

County Superior Court, which is located with the Northern District. Accordingly, venue is proper in this Court. 28 U.S.C. § 2241(d).

**STANDARD OF REVIEW**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id.* § 2254. Under AEDPA, the federal court may only grant habeas relief if the state court's ruling was "contrary to, or involved an unreasonable application of ...," clearly established Supreme Court precedent or the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

Under the "contrary to" clause, a federal court may grant the writ if the state court either arrives at a conclusion opposite to one reached by the Supreme Court on a question of law or if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the unreasonable application standard, a federal court may "grant the writ if the state court identifies the correct governing legal principle ... [but] unreasonably applies that principle to the facts of the prisoner's case." *Id.* To meet this standard, a federal court must have more than merely an independent judgment regarding a state court's application of federal law. *Id.* at 411. "As a condition for obtaining habeas corpus ..., a state prisoner must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

**ANALYSIS**

Shell raises four claims of error. In his petition, he alleges that: (1) the State improperly denied a motion for the government to disclose the identity of a confidential informant; (2) the jury instruction on un-joined perpetrators was improper in this context; (3) the judge improperly overruled an objection to the prosecution's closing statements; and (4) the jury instruction on witnesses in custody was improper in this context.

**A.     The Trial Court Properly Denied Shell's Motion to Disclose the Confidential Informant's Identity Because Disclosure Was Immaterial.**

This Court must address the question of whether the failure to disclose the confidential informant's identity was an unconstitutional violation of due process under *Brady v. Maryland*, 373 U.S. 83 (1963). Shell argues the confidential informant was a material witness in the case. Specifically, Shell points to the confidential informant's direct observation of C.T. walking with what appeared to be the murder weapon. In addition, Shell points to what the confidential informant heard from witnesses Galloway and Mitchell. Shell argues that disclosure of the confidential informant's identity may have led to other potentially exculpatory evidence.

It is a violation of Constitutional due process for the prosecution to withhold evidence which is material to guilt or punishment in a state criminal proceeding. *Brady*, 373 U.S. at 87. For evidence to be material, there must be a reasonable possibility that the evidence would be decisive to the outcome of the case. *Cone v. Bell*, 556 U.S. 449 (2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J., concurring)).

**1.     The Trial Court Applied a Reasonable Interpretation of Supreme Court Precedent When It Disregarded Inadmissible Evidence In Its *Brady* Analysis.**

This Court must resolve whether the trial court appropriately disregarded inadmissible evidence when it determined the materiality of the confidential informant's information or if the trial court should instead have considered whether the confidential informant's inadmissable information might have led to other exculpatory evidence.

Circuit courts maintain competing views as to whether inadmissible evidence is automatically barred from being considered material under *Brady*. *Paradis v. Arave*, 240 F.3d 1169, 1178 (9th Cir. 2001) ("There is no uniform approach in the federal courts to the treatment of inadmissible evidence as the basis for *Brady* claims ... Some circuits have held that if evidence is itself inadmissible, then it cannot be material under *Brady* ... Others allow that inadmissible evidence can be material under *Brady,* if it could have led to the discovery of admissible evidence."). In the Eleventh Circuit, inadmissable evidence can be considered material for *Brady* purposes if it could lead to other potentially exculpatory evidence. *Wright v.*

7

*Hopper*, 169 F.3d 695, 703 n.1 (11th Cir. 1999) (citing *Wood v. Bartholomew*, 516 U.S. 1 (1995)). The Fourth Circuit considers all inadmissible evidence automatically immaterial for the purposes of a *Brady* claim. *Hoke v. Netherland*, 92 F.3d 1350, 1355 n.3 (4th Cir. 1996) (citing *Wood*, 516 U.S. 1). The Ninth Circuit is unsettled on the subject. *See Paradis*, 240 F.3d at 1178 ("It appears that [Ninth Circuit] law on this issue is not entirely consistent ... The instant case does not require resolution of that possible conflict...."). When Supreme Court precedent does not answer a particular question, a state court's decision is not an unreasonable application of federal law under AEDPA. *Ponce v. Felker*, 606 F.3d 596, 604 (9th Cir. 2010) (quoting *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (noting that "[i]f Supreme Court cases 'give no clear answer to the question presented, 'the state court's decision cannot be an unreasonable application of clearly established federal law.'")). A federal court cannot grant habeas relief based on a Circuit Court's interpretation of the law. *Harris v. Garcia*, 734 F. Supp. 2d 973, 988 (N.D. Cal. 2010) ("While a state court decision may no longer be overturned on habeas review simply because of a conflict with circuit-based law, circuit decisions may still be relevant as persuasive authority.") (citing *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003)).

The trial court's interpretation of Supreme Court precedent is the same as that of the Eleventh Circuit in *Hoke*, *i.e.*, that inadmissible evidence is not considered for a *Brady* claim. (*See* Exh. 4 at 12.) As both the Eleventh and Fourth Circuits cite the exact same Supreme Court case for opposing conclusions on the question of whether inadmissible evidence can be used to show materiality in a *Brady* claim, Supreme Court precedent provides no clear answer to that question. *Compare Wright*, 169 F.3d at 703 n.1 (citing *Wood*, 516 U.S. 1), *with Hoke*, 92 F.3d at 1355 n.3 (citing *Wood*, 516 U.S. 1). A state court that adopts either of these interpretations, such as the state court in this case, does not make an unreasonable application of clearly established federal law. *See Harris*, 734 F. Supp. 2d at 988.

Therefore, the state court's assumption that inadmissible evidence is not relevant to materiality for a *Brady* claim is a reasonable interpretation of Supreme Court precedent, and is not grounds for this Court to grant a petition for habeas corpus under AEDPA. Therefore, this Court will not consider inadmissable evidence in its *Brady* analysis nor will it allow such

evidence to drive speculation as to what other information the confidential informant might have known.

### 2. The Parties' Stipulation About the Confidential Informant's Observations Renders That Information Immaterial.

This Court must resolve whether the confidential informant's personal observation of C.T. walking with what appeared to be a gun was itself enough to require disclosure of the confidential informant's identity in light of the parties' stipulation to this fact at trial. (Exh. 4 at 14.) Both parties stipulated that the jury would take as true that the confidential informant saw C.T. walking stiff-legged down Center Street as part of a compromise the trial court suggested to maintain the confidential informant's anonymity without prejudicing Shell. (*Id.*) Shell argues that the confidential informant's observation of C.T., the brother of another potential suspect, walking stiff-legged as if with a gun, was enough to compel disclosure of the confidential informant's identity.

A court must weigh the government's privilege regarding confidential informants against the need for disclosure to maintain fairness. *Roviaro v. United States*, 353 U.S. 53, 60 (1957). The trial court's suggestion of a stipulation struck a fair balance between these competing interests of confidentiality and disclosure. It maintained the informant's confidentiality so the police could continue to receive valuable information while at the same time allowing the informant's information to bolster the defense. The jury did not need to assess the confidential informant's credibility at trial because the court instructed the jury to take this potentially exculpatory information as true. (Exh. 4 at 14.) Any unfavorable credibility determination would only have helped the prosecution. As the Appellate Court pointed out, the defense "ably used" this stipulation to argue third party culpability. (*Id.* at 8.)

Therefore, this Court finds that putting the confidential informant on the stand would not have changed the outcome of the trial. Thus, there is no reasonable possibility that the confidential informant's identity would change the impact of this evidence. The parties' stipulation renders the confidential informant's personal observation immaterial under *Brady*

9

because there is no reasonable possibility it would impact the outcome of the trial. *See Cone*, 556 U.S. at 449.

### 3. The Admissible Statements Mitchell Made to the Confidential Informant Were Immaterial in Light of Other Evidence and the Prosecution's Strong Case.

The Court must determine whether the remaining admissible evidence, which was not stipulated to as true by the parties, was material under *Brady*. The remaining information the confidential informant knew which did not reach the jury by stipulation consisted of Mitchell's statement that he was holding C.T.'s gun. Mitchell, another Lower Bottoms gang member, told the confidential informant he was holding the murder weapon used in the shooting. Mitchell said he was holding the gun for C.T., the weapon's owner. Mitchell was on parole, so it was illegal for him to possess the firearm. (Exh. 4 at 12.) The Appellate Court found that the confidential informant's testimony relating Mitchell's statement would not have been hearsay because it was a declaration against penal interest by an unavailable witness. (Exh. 4 at 12, citing Cal. Evid. Code § 1230.) Thus, the confidential informant's testimony relating Mitchell's statements would have been admissible. For the information to be material under *Brady* there must be a reasonable possibility that it would change the outcome of the trial. *See Cone*, 556 U.S. at 449.

#### a. Mitchell's Statement Was Immaterial Because of Other Evidence In the Record.

In Shell's original confession, he told police he never possessed the gun before or after the shooting. (Exh. 4 at 6.) If Shell never possessed the gun before or after the shooting, evidence indicating that another possessed the gun two weeks later does not indicate Shell's innocence. Whether someone else possessed the murder weapon was not material as Shell had already stated in his original confession that he did not own the gun. The jury could simply have believed Shell's original confession rather than his testimony at trial.

10

In addition, a gang expert testified that after shootings, gang members tend to distance themselves from murder weapons by passing them off to fellow gang members. (Exh. 4 at 13.)[1] Thus, even if the jury believed that Shell did indeed possess the gun, another's later possession of the gun would not be material. The jury could simply have credited the gang expert's testimony.

### b. Mitchell's Statements Were Immaterial Because of the Prosecution's Strong Case.

Shell argues that this case was a close call for the jury. Shell argues that if this was a close case, the testimony of the confidential informant was more likely to change the outcome rendering the evidence material. To this end, Shell points to the questionable interrogation tactics of the Oakland police to show that this case was not as straightforward for the jury as a normal confession case. (Petitioner's Mot. at 16-19.)

Despite Shell's argument that his original confession was false, Shell's confession made the prosecution's case against him very strong. The morning after the unrecorded interrogation, Shell confessed to both the district attorney and police on tape. (Exh. 4 at 5.) Shell confessed after officers read him his rights and with knowledge that his statements were recorded. (Exh. 12 at 2.) Both Shell and his co-conspirators provided very detailed accounts which independently corroborated each other's stories.[2] (Exh. 4 at 15.) Shell's confession and the accounts of the co-conspirators who testified against him were consistent with the testimony of the surviving victim as well as physical evidence from the scene. (*Id.*) With such a detailed and verifiable confession, Mitchell's statement would not have changed the outcome of such a strong case.

---

[1] The gang expert's testimony on this point was relevant to the trial even though the confidential informant did not testify because the parties stipulated to the fact that the informant potentially saw the murder weapon.

[2] Shell's testimony was not completely consistent with that of his co-conspirators. Notably, his co-conspirators testified that Shell was a willing participant in the crime while Shell maintained he was forced to do the shooting. (Exh. 4 at 1-9.) Despite these inconsistencies, Shell had detailed information about the scene he could not possibly have known without also being in the car during the shooting. For instance, he knew the clothing worn by his co-conspirator and where each person sat in the vehicle. (Exh. 4 at 15.)

11

Therefore, there is no reasonable possibility that Mitchell's statement that he was holding the murder weapon owned by another suspect would have changed the outcome of this case. The only admissible evidence the confidential informant knew which was not related to the jury via stipulation was Mitchell's statement. This minor piece of evidence was not material under *Brady* because there is no reasonable possibility that the information would have changed the outcome in the case. *See Cone*, 556 U.S. at 449. The trial court's failure to expose the identity of the confidential informant was, therefore, not an unreasonable application of federal law because the trial court's interpretation properly applied *Brady*. As the trial court did not unreasonably apply federal law, this Court cannot overturn the trial court's decision under AEDPA.

**B.     The Jury Instruction on Un-Joined Perpetrators Did Not Shift the Prosecution's Burden of Proof.**

The trial court instructed the jury on un-joined perpetrators in accord with California Criminal Jury Instruction Number 373 ("CALCRIM 373"), as follows:

> The evidence shows that other persons may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial. You may not speculate as to whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged. This instruction does   not apply to the testimony of Mario Hairston and Tonney Killingsworth.

Shell contends that this instruction lessened the prosecution's standard of proof because Shell argued at trial that someone else committed the crime. Shell argues this instruction led the jury to believe they should disregard Shell's theory that another suspect actually committed the crime. Shell contends that the jury reasoned that considering Shell's theory that someone else committed the crime would speculate on why authorities did not prosecute or investigate that suspect, exactly what Shell says this instruction cautions against.

If a jury instruction lightens the prosecution's burden of proof to something less than beyond a reasonable doubt by shifting the burden of proof to the defendant, then that instruction violates the Due Process Clause of the Fourteenth Amendment. *Sandstrom v. Montana*, 442 U.S. 510, 523-24 (1979) (overruled in part on other grounds by *Boyde v. California*, 494 U.S.

1  370, 380 (1990)). For an ambiguous instruction to warrant grant of a petition for habeas corpus,
2  there must be a "reasonable likelihood" the jury applied the instruction in a way which would
3  violate the Constitution. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Boyde*, 494 U.S. at
4  380). The instruction must be construed in the context of all other instructions and the entire
5  trial record rather than in isolation. *Id.* (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

6  In *Farmer*, the California Supreme Court interpreted a predecessor jury instruction in
7  the context of a defense that someone other than the defendant committed the crime. *People v.*
8  *Farmer*, 47 Cal. 3d 888, 918 (1989) (disapproved on other grounds by *People v. Waidla,* 22
9  Cal. 4th 690, 724 n.6 (2000)). On appeal to the California Supreme Court, the defendant argued
10 that the instruction on un-joined perpetrators hindered the defendant's ability to present a theory
11 of third party culpability because the instruction deflected the jury's attention away from the
12 third party's role. *Id.* The argument in *Farmer* is essentially the same as Shell's; that
13 instructing the jury not to speculate on others who might be prosecuted undermined the
14 defendant's ability to show that someone else committed the crime. In *Farmer*, the California
15 Supreme Court rejected this argument. *Id.* It reasoned that "the instruction does not tell the
16 jury it cannot consider evidence that someone else committed the crime ... It merely says the
17 jury is not to speculate on whether someone else might or might not be *prosecuted*." *Id.*
18 (emphasis in original). The court in *Farmer* determined that the instruction accurately stated
19 the law and was not misleading. *Id.*

20 The *Farmer* court's analysis is persuasive. The jury instruction asks the jury not to
21 speculate on whether another might be prosecuted, not whether another committed the crime.
22 In addition, the disputed jury instruction explicitly states that it is still the jury's duty to decide
23 whether the defendant on trial committed the crime charged. This language makes it difficult
24 for the jury to interpret the instruction to absolve them of this duty. As the Appellate Court
25 correctly found, Shell's "convoluted reading of CALCRIM 373 is not plausible, and no juror
26 would have misunderstood the instruction to allow defendant's conviction for a crime
27 committed by another man." (Exh. 4 at 20.)

28

13

1    Thus, there is no reasonable likelihood the jury would agree with Shell's convoluted
2 interpretation of the disputed jury instruction because it instructed the jury not to speculate on
3 whether other individual's were prosecuted, not whether others may have actually committed
4 the crime. The prosecution had the burden to prove that Shell, and not someone else,
5 committed the crime. Thus, this Court may not overturn the state court's determination on
6 habeas review because there is no "reasonable likelihood" that the jury misinterpreted
7 CALCRIM 373 in a way that shifted the prosecution's burden of proof.

**C.    The Prosecution's Closing Statements Were a Correct Statement of Law and Therefore Did Not Deprive Shell of Due Process.**

9    This Court must resolve the issue of whether the prosecution's closing arguments
10 infringed on Shell's due process by misstating the law. During closing arguments, the trial
11 court overruled the defense's objection to the prosecutor's statement that the jury need not
12 "somehow prove there's no reasonable possibility that [Matthew T.] committed this crime."
13 (Exh. 4 at 22.) Shell argues that the trial court improperly overruled his objection because the
14 statement incorrectly presented the standard of proof in violation of the Sixth and Fourteenth
15 Amendments.
16    For this Court to overturn a state court decision based on the statements of a prosecutor,
17 the statements must not just be erroneous, but must violate the Defendant's due process rights.
18 *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). The statement must so infect the
19 proceedings with unfairness as to render the conviction a denial of due process. *Id.*
20    The jury instruction on reasonable doubt in this case states that "[t]he evidence need not
21 eliminate all possible doubt because everything in life is open to some possible or imaginary
22 doubt." (Exh. 10 at 4.)   The Supreme Court upheld a similar jury instruction indicating that a
23 jury need not eliminate all possible doubt. *See Victor v. Nebraska*, 511 U.S. 1, 17 (1994). The
24 prosecutor correctly cited the distinction between reasonable doubt and merely possible doubt.
25 (*See* Exh. 4 at 23.) The fact that the prosecution used the phrasing "reasonable possibility"
26 rather than "possible doubt" has no impact on the result because both phrases accurately reflect
27 the fact that the prosecution only need prove a defendant guilty beyond a reasonable doubt.
28 (Exh. 4 at 23.) Even if the prosecution's statement did misstate the law, the fact that this was

14

1  one statement in very long set of closing remarks in a very long trial in which the jury was

2  properly instructed means that such a misstatement does not rise to the level of violating Shell's

3  right to due process. One statement does not infect the entire proceeding with the level of

4  unfairness required under *Donnelly.* 416 U.S. at 642.

5        Therefore, the prosecutor in Shell's case correctly stated the law. The state court judge

6  correctly overruled the defense's objection. As this was a correct statement of law, it did not

7  deprive Shell of due process. Therefore, this Court cannot grant a petition for habeas corpus on

8  the grounds of the prosecution's closing arguments. *See id.*

### D. The Instruction on Witnesses in Custody Did Not Infringe on Shell's Sixth Amendment Right to Present Impeachment Evidence.

The court instructed jurors on testimony from in-custody witnesses in accord with California Criminal Jury Instruction Number 337 ("CALCRIM 337"), as follows:

> When Jonathan Gonzalez, Mario Hariston, and Tonney Killingsworth testified, they were in custody. The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you.

CALCRIM 337.

#### 1. The Instruction On Witnesses in Custody Did Not Hinder Shell's Ability to Question Gonzalez's Credibility.

Shell raises the issue of whether this instruction infringed on his right to present impeachment evidence under the Sixth Amendment. U.S. CONST. Amend. XI. Shell argues that the custody of some witnesses was relevant to credibility. Shell argues that CALCRIM 337 infringed on his Sixth Amendment rights because it instructed the jury that the custody status of a witness is irrelevant to credibility. Specifically, Shell argues that the instruction caused the jury to discount the fact that Gonzalez, the surviving victim, was in custody as a witness. Shell argued to the jury that the they should believe Gonzalez's earlier statements to police, stating that another suspect shot him, rather than his testimony at trial, stating he did not know who shot him. Shell contends that, as a gang member, Gonzalez was concerned about being labeled a "snitch" from his public testimony at trial out of fear of reprisal from rival gang members. Shell claims that CALCRIM 337 caused the jury to disregard that Gonzalez was a reticent

15

1 witness compelled to testify in their credibility determination. Therefore, Shell argues that
2 Gonzalez's custodial status was relevant in assessing credibility.

3 The trial court also gave the jury California Criminal Jury Instruction Number 226
4 ("CALCRIM 226") which instructed the jury to consider whether factors such as bias,
5 prejudice, personal relationships, or personal interest influenced the witness' testimonies. (Exh.
6 10 at 4.)

7 For an ambiguous instruction to warrant grant of a petition for habeas corpus, there must be a
8 "reasonable likelihood" the jury applied the instruction in a way that would violate the
9 Constitution. *Estelle*, 502 U.S. at 72 (citing *Boyde*, 494 U.S. at 80). The instruction must be
10 construed in the context of all other instructions and the entire trial record rather than in
11 isolation. *Id.* (citing *Cupp*, 414 U.S. at 147).

12 CALCRIM 226 ensured that the jury properly weighed any "personal interest" Gonzalez
13 may have had, including his reputation as a gang member. CALCRIM 337 read in light of
14 CALCRIM 226 did not preclude Shell from questioning Gonzalez's motives. Whether
15 Gonzalez was in custody is not relevant to his motives. CALCRIM 226 explicitly tells the jury
16 to take motives into account when determining credibility.

17 Thus, when both CALCRIM 337 and 226 are read together, as *Estelle* directs, there is no
18 reasonable likelihood the jury misinterpreted CALCRIM 337 to discount Shell's arguments that
19 Gonzalez were not credible. Therefore, under *Estelle*, CALCRIM 337 does not merit granting a
20 petition for a writ of habeas corpus. *See* 502 U.S. at 72.

**2. The Instruction On Witnesses In Custody Did Not Hinder Shell's Ability to Question the Credibility of His Co-Conspirators.**

22 Shell argues the custody of Shell's co-conspirators was relevant to their credibility, as
23 they each accused Shell of the crime and received lesser sentences by doing so. California
24 Criminal Jury Instruction Number 335 ("CALCRIM 335") instructed the jury to view testimony
25 of an accomplice who incriminates the defendant with caution. (Exh. 10 at 9.) The trial court
26 also gave the jury California Criminal Jury Instruction Number 335 ("CALCRIM 335") which
27 instructed the jury to view the testimony of an accomplice that implicated the Defendant with
28 caution. (Exh. 10 at 9.) For an ambiguous instruction to warrant grant of a petition for habeas

16

corpus, there must be a "reasonable likelihood" the jury applied the instruction in a way that would violate the Constitution. *Estelle*, 502 U.S. at 72 (citing *Boyde*, 494 U.S. at 80). The instruction must be construed in the context of all other instructions and the entire trial record rather than in isolation. *Estelle*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147).

CALCRIM 335 ensured the jury properly weighed the fact that Shell's co-conspirators stood to benifit from accusing Shell in a credibility determination because it warned jurors to view the testimony of a co-conspirator with caution. CALCRIM 337 read in light of CALCRIM 335's admonition against trusting the testimony of co-conspirators did not preclude Shell from questioning his co-conspirator's credibility. In fact, CALCRIM 335 specifically told the jury to question their credibility based on their status as a co-conspirator. Whether or not they were in custody was irrelevant because the jury knew they were co-conspirators who stood to gain by accusing Shell.

Therefore, when both CALCRIM 337 and CALCRIM 335 are read together, as *Estelle* directs, there is no reasonable likelihood the jury interpreted CALCRIM 337 to discount Shell's argument that his co-conspirators were not credible. *See* 502 U.S. at 72. Therefore, under *Estelle*, CALCRIM 337 does not merit granting a petition for a writ of habeas corpus. *See id.*

## CONCLUSION

For the reasons set forth, the petition for a writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: August 6, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE